Next case we have is United States, et al, v. Express Scripts, et al, number 14-1029. And we have Mr. Maganini and Mr. Marino. Ms. Manag... You're going to have to pronounce that for me one more time, but I'll try to get it right. Mr. Starczyk, Martin, and Donilon. Got it. Thank you. Whenever you're ready, Counsel.  Your Honor, may it please the Court, Robert Maganini from Stone and Maganini. With me is my partner, Jason Spiro, and Danielle Morbier, and William Herlock is co-counsel. We'd like three minutes of rebuttal, if that's okay. That's fine. Thank you, Your Honor. Your Honor, we're here representing Relator David Morgan. We come before this Court asking you to reverse the District Court's findings and restore his claims. When you view Mr. Morgan's actions as an original source, and you review the public disclosure guidelines that this Course has put out in Schuman, Atkinson, Stinson, and Paranich, it is clear that there was no public disclosure under 3730E4 of the False Claims Act. The defendants have raised in the District Court apparently accepted that there were numerous purported public disclosures prior to Mr. Morgan revealing this fraud to the government. When you actually go back and look at the public disclosures, though, you're right. Why don't we do them one by one? Let's start, let's say, with the pharmacy benefit defendants, or manager defendants. It looks like this is fairly close to what was alleged in the Fidelity case, and how would you respond to that? I would say it's not, Your Honor. The Fidelity case, if you actually look at paragraph 68 of their complaint, the Fidelity plaintiffs say, upon information and belief, they believe First Data Bank is conducting polling and its prices are inflated. In fact, the fraud that Mr. Morgan has detected was that First Data Bank was not conducting any polling. In the late 1990s, Your Honor, this is- How did Mr. Morgan first come across this fraud? He is a forensic auditor of PBMs and medical plans, and he had initially been, since the 1980s, had installed computer systems in pharmacies, and as part of that, he was allowed to choose which pricing database the pharmacies would use. Back then, the costs that Red Book published, which were the drug prices put out by the manufacturers, were the exact same as what the Blue Book put out. And over time, beginning in 1999, from Mr. Morgan's audits, he determined that the Blue Book prices began to increase, and he couldn't determine why. And so what he did, though, was he audited- Okay, and the Blue Book is a public disclosure, right? No, Your Honor, it is not. The Blue Book itself publishes prices that- All right. The information in the Blue Book is public information. Well, no, Your Honor. You have to actually subscribe to it. And the other thing- If you subscribe to it, you can get it- You can get it, right, but the Blue Book does not keep any historical files, Your Honor, so you have to not only buy it and maintain it. The other thing you had to do that Mr. Morgan did because of his auditing business, he might be one of two or three- But you and I could- Judge Roth could subscribe to the Blue Book as members of the public. We could, Your Honor, yeah. Now, whether you'd understand what's in it, I don't know, because it's not a simple- Well, there are people who can. People like Mr. Morgan. That's right. And we've actually retained other forensic PBM analysts, Your Honor, and they've told us they only subscribe to one database. They only would subscribe to Blue Book. Mr. Morgan was one of the only people we've ever come upon who actually had both Red Book and Blue Book prices, so he was able to compare. And when you actually look at the prices, it's not a direct comparison. But haven't we held that the specialized experience and training of someone looking at public information is not adequate to make an original source, to create an original source? Yes, you have, Your Honor, and in this case, though, the other information besides the Blue Book and Red Book that you needed was pricing information from the PBMs. The way Mr. Morgan obtained those was through auditing PBMs and getting their contracts. Mr. Morgan also, in the Fidelity case, that was protected by a confidentiality order. So unless you were an expert, you wouldn't have been able to get any information from that case. We're not agreeing that Mr. Morgan got information from the Fidelity case. As I said, when you look at their complaint, it's different and it's actually wrong from the fraud Mr. Morgan proves. What Mr. Morgan had to do was get the pricing information from the PBMs. He had to get the pricing points from the Red Book and the Blue Book. He had to build his own algorithm and compare them, and he couldn't do that until he actually audited Caremark, Your Honor, in 2003. And Caremark, as part of the audit, gave him 250 drug prices going back 10 years. That enabled him to have a historical background and go back and do the audit. The other thing Mr. Morgan had done in his audits, he had done audits for the state of New York, for the state of Pennsylvania, for the federal government, for the FBI, and he had a collection of about 50 million of claims. And so he was able to run those claims and determine that this mathematical increase between the Blue Book and the Red Book was, in fact, occurring. And the fraud then that he found, that is part of the evidence that he came up with. The fraud that he found was that First Data Bank was not doing surveys. Back in 2000, First Data Bank, in order to address concerns that AWP had been inflated by drug manufacturers, told the government that they would conduct surveys, they would throw out the highest and lowest price points, and then they would average them, and the government would get a real price of what actual people buying drugs were paying. In fact, based on Mr. Morgan's investigation, they were not conducting the surveys. And that is the fraud. And because they weren't conducting the surveys, the federal and state governments were paying more money than they should have been for the drugs. And that's never been publicly disclosed in any of the disclosures, any of the documents, any of the congressional reports, any of the lawsuits. The first complaint that was filed, at least as to First Data, alleged that the scheme involved manipulation of Blue Book prices. And then the second complaint talks about a conspiracy. And it seems that it's really following along what others are, in the second complaint, what others in the meantime have alleged. Well, what Mr. Morgan did, Your Honor, we don't think that there was any change in the scheme. The scheme was always that First Data Bank had promised to do surveys to come up with a real accurate price. They did not do the surveys. They published false information. Mr. Morgan, as part of his investigation, called wholesalers such as AmerisourceBergen. They knew they were not being surveyed. He audited the PBMs. When was the New England Carpenters Fund case filed? That was in June of 2005, Your Honor. And when was your amended complaint filed? It was in 2006, Your Honor. The original complaints filed by Mr. Morgan, however, were on March 28th. He filed cases against Medco and Caremark in the Eastern District of Pennsylvania, and I believe on March 31st filed against ESI Express Scripts in the District of New Jersey. And those cases explain the First Data Bank fraud and the fact that the PBMs knew about the fraud and took advantage of it to overbill the federal and state governments. I thought the only argument that your client made, at least in the briefing, was that, for example, Amerisource was never named in the New England Carpenters Fund case and that somehow he was naming them here. But the allegations are essentially the same, are they not? Well, the allegations – Whether you're leaving out one party or not leaving out a party. That's right, Your Honor. What we're saying is the fraud Mr. Morgan developed and uncovered, really, and presented doesn't change. What he was able to do was we tracked it further down. Mr. Morgan's a forensic auditor, so what he was trying to do was follow the money. First Data Bank didn't do surveys, publish prices. The people who benefited most monetarily from the inflated prices were the PBMs. Because of the increased prices, they were able to charge the federal and state governments. I realize to be a forensic investigator or a forensic analyst here takes training and a discipline. But when you look at some of the allegations here, it looks as if what he calls a statistical analysis is really just subtracting one number from another and then performing some simple division. It'll take several hours to actually explain, Your Honor. Actually, once we brought this case to the U.S. Attorney's Office, it took us about three or four years of Mr. Morgan coming in and laying out how the prices changed. Because they didn't always change together. They weren't changed at the same time. Mr. Morgan determined that only self-administered drugs had the prices being inflated, not injectables. Controlled substances did not have the prices inflated. Drugs that were heavily advertised did not have the prices inflated. This was a very long, convoluted process to get the government to the point where they said, You're right, we're being defrauded. And I think the evidence of that, Your Honor, is the fact that the government intervened in Mr. Morgan's case. It did not file its own case. It settled with Medco for $360 million. Medco said in the settlement agreement that they were providing false pricing information to First Data Bank. Obviously, the issue here isn't whether there was a problem. It's whether your client is the first source for finding that problem. Correct, Your Honor. And as I said, we believe he is. If you go through the public disclosures, none of them say that First Data Bank was not conducting surveys and publishing false inflated prices that the federal and state governments were being charged for. We'll add another minute onto your time at rebuttal. Thank you, Your Honor. So you reserved how much time for rebuttal initially? Yes. It was three minutes, Your Honor. We'll give you four. Thank you. Good morning, Your Honors, and may it please the Court. The district court properly dismissed the relator's third amended complaint against CBS Caremark under the FCA's public disclosure bar because its allegation of fraud was publicly disclosed before that complaint was ever filed and the relator was not an original source. With respect to public disclosure, the allegation of fraud, that Caremark misrepresented the AWP for prescription drugs, charging the government the blue book AWP while concealing the price differential between the blue book AWP and the lower red book AWP Caremark actually paid for those drugs and pocketing the spread, that fraud was publicly disclosed in lawsuits and elsewhere before the relator ever made that allegation against Caremark. And, Your Honor, Judge Anwar, you mentioned the Fidelity case beginning on March 17, 2003, with the American Federation of State, County, and Municipal Employees action versus advance PCS, March 26th action, Irwin versus advance in 2003, March 31st of 2003, there was an article by Barbara Martinez in the PBM firm's profit on generic drugs in which she described this AWP as what to stand for ain't what's paid. The Fidelity case that Your Honor adverted to filed on February 20, 2004, alleged that ESI, one of now only two PBMs in existence, quote, knew or should have known that First Data Bank's blue book AWP pricing was inflated and this did not represent the lowest possible AWP price available. That's at A679. By choosing the blue book as the pricing source for AWP, ESI maximized its revenue. That's A679 also at 109. Fidelity also alleged that ESI created a secret spread between the price it received from the Fidelity for brand name prescriptions and the price it paid. And it goes on and on. Also in Brown, October of 2004. But most significantly, this NEC litigation is essentially the same set of allegations. The complaint there alleged an agreement between First Data Bank and McKesson to, quote, raise the wholesale cost to AWP spreads referred to as the 5% spread scheme. Was that the first case that alleged a fraudulent conspiracy? I don't think so. I don't think it would be fair to say that, Your Honor, because if you go back to the beginning, that's the essence of all this. We talk about the Z comprising the X and Y, the Z being the fraud itself and the X being the false set of facts and the Y being the true set of facts. That's all out there in these cases. And it's very interesting, this suggestion that's made here that, you know, Mr. Morgan sat at his kitchen table, he and his wife, they got the blue book and they got the red book, and they built this algorithm. And it sounds like a great deal of work, but it's not a great deal of work. The reality is, as Judge Roth indicated and Your Honor as well, these books are out there. They're available. That Mr. Morgan chose to subscribe to both, paid for both of them. It's great, but it doesn't come close to satisfying the test. Think about what the test really is. It's pretty clear. You have to have, first of all, to suggest that he's an original source, because I don't think there's a serious argument that it was not publicly disclosed. But to suggest that he's an original source of his allegations against Kiermaier, you have to show he had direct and independent knowledge of the information on which the allegations are based. So direct knowledge is firsthand knowledge, not based on someone else's labor, not based on, as Your Honor pointed out, this sort of iterative series of going from an increasingly specific allegation as these other complaints are filed out there. That's not what's known as firsthand knowledge. And, again, this idea of independent knowledge, him having independent knowledge that didn't depend on these other public disclosures, it really doesn't make any sense at all. The simple fact is I won't be labored. I have lots of folks come up and talk to you about this. But what's clear is that this is precisely the kind of behavior that the public disclosure bar was designed to prevent, and this business of the original source exception, it could not possibly apply to someone who did, ultimately, as little as was done here, to basically put these allegations together. Thank you. Good morning. May it please the Court. E. Newman Agee from Williamson Connolly for PBM's Express Scripts and Medco. As my colleague who represents Caremark CVS indicated, there are essentially two types of allegations as it relates to the PBMs here. There's the inflated AWP allegation, and then there is the secret spread allegation. Now, the fidelity litigation that said that the numbers were unreliable, the amended complaint here, or Mr. Morgan's complaint, was they're not just unreliable but fraudulently inflated. Wouldn't that be substantively different? Well, Your Honor, I think fidelity, just like Mr. Morgan's complaint, fidelity went through a series of amendments over the course of several years. And so, for example, the second amended complaint for fidelity was August 2004, and that predates the complaint being filed in this matter, March 2005. It's saying the numbers don't jibe, they're unreliable, but the new twist is Mr. Morgan's complaint that they're fraudulently inflated. Well, the fidelity second complaint, Your Honor, indicates that the pricing was inflated. First Data Bank's blue book pricing was inflated, didn't represent the lowest possible AWP price, created a secret pharmacy. ESI created a secret pharmacy spread between the prices that were involved and charged one thing to one and got paid another thing from another. And so I think in terms of the X and the Y, the X and the Y is absolutely there. And I would submit to you that it's very clear, Your Honor, under fidelity, that the Z is there also. It's absolutely clear. In fact, I think from a public disclosure point of view, this is as straightforward a case as you can get. Fidelity and Brown, both of which were cases that were brought against Express Scripts, which was one of the first PBMs named in this particular piece of litigation, is nearly identical. So I don't think that there can be any serious argument that there has not been a public disclosure. With respect to the original source, I think that it is equally clear both under Schuman as well as the cases that predate Schuman, the Atkins case, the Zizek case, the Stinson case, all by the Third Circuit, that Mr. Morgan is not an original source here. The Schuman court found essentially what Mr. Morgan did was compare two publicly disclosed numbers and, as Your Honor indicated, subtracted them and did some division. He did some of this, although this is in dispute, he did some of this while he was a litigation expert for the Fidelity case. That under Schuman and the prior case law is simply not enough. In Schuman, the panel found that reviewing confidential and internal documents was insufficient. Discussing those documents, even with people who actually participated in the events, was insufficient. Direct and independent knowledge of business activities didn't suffice. They needed to have knowledge of the actual False Claims Act violations. And just because someone was an expert in a particular area or a particular industry, that was not sufficient. And here, Mr. Morgan is even one step removed from Mr. Schuman. Mr. Schuman actually was employed by Medco and had access to individuals, had access to the other side, and even so, the finding of the Third Circuit was that is not enough for an original source. Mr. Morgan here was not employed by any of the entities involved here. He was retained for some period of time as an expert in a case where one of the entities, our client, Express Scripts, was a defendant. But by his own admission, by his own counsel's admission, they indicate that they did not even use what was gained during that expert work for the purpose of this case. Rather, he did it completely independently. And the fact that he says he did it completely independently, even under Mr. Morgan's version of events, Schuman completely forecloses Mr. Morgan being an original source. If I may correct two inaccuracies on the record, I think my colleague, Mr. Morgan's counsel, misspoke and indicated that there had been a settlement with Medco. Medco is very much a defendant in this case still, and the settlement was, in fact, with McKesson. Second, I think that there seems to be some disagreement as to the timing of when Medco was added as a defendant. Medco was added as a defendant in May 2006. All right. Thank you very much. Thank you. Mr. Sitarczyk. May it please the Court, Counsel Eric Sitarczyk for AmerisourceBergen. Your Honor, AmerisourceBergen stands in a position that I think provides an additional reason for affirmance beyond what some of the other defendants have, and that's the timing of when AmerisourceBergen was sued. The original complaint is in 2005. Alleges misconduct by Express Scripts, First Data Bank with respect to the When was the NEC litigation filed? The NEC litigation was filed. The first complaint was filed June 2, 2005. The second complaint was filed July 17, 2006. And that was before this? All of those were before AmerisourceBergen. And Amerisource was hardly mentioned in the NEC complaint, the first complaint, was it? It was mentioned, Your Honor. It was mentioned, but referenced only, it seemed like, only in passing. It was mentioned in passing but in an important way, and the important way is this. The NEC complaint, which is reflected in Relator's first complaint against AmerisourceBergen, Cardinal McKesson, and all the other wholesalers in the world, that NEC complaint says that McKesson was surveyed by First Data Bank and inflated the figures. The other wholesalers were not surveyed. The NEC complaint says the other two major wholesalers, Cardinal and AmerisourceBergen. Easy inference there, not being surveyed. When Relator files his first complaint against any of the wholesalers, he says AmerisourceBergen, Cardinal are not being surveyed, McKesson is being surveyed. Same exact scheme alleged in the NEC. I mean, obviously, Mr. Magnetti is relying on the 11th Circuit's case in Cooper, which says that if you allege industry-wide problems, then the disclosure bar doesn't apply necessarily. How would you distinguish Cooper? I'd distinguish it in two ways, Your Honor. One is factual, and that is that AmerisourceBergen was named in prior disclosures. It's referenced in the NEC complaint. But in addition to that, there is a Wall Street Journal article that comes out on October 6, 2006, less than two months before the first complaint is filed against the wholesalers, including AmerisourceBergen. And in that, it repeats the allegations in the NEC complaint, because it's talking about the settlement of that complaint. And then the reporter calls somebody from AmerisourceBergen and says to the spokesperson, have you been surveyed? And they say no. So it is out there in the public domain before they file the complaint that the essence of their allegation against AmerisourceBergen, which is that it essentially participated in this conspiracy by not participating, by not being surveyed, it's out there. That's number one. Number two, Your Honor, is that this is very much the NEC complaint, an allegation where AmerisourceBergen is readily identifiable, just like in the Zizek case. Your Honor, why is it readily identifiable? Because the complaint says there are three major wholesalers. One of those wholesalers, McKesson, is being surveyed. The others are not. The other two major wholesalers, AmerisourceBergen, Cardinal, they're exactly who were alleged in Belaiter's complaint when they finally brought in the wholesalers after NEC, and the same allegation that they were not surveyed. So I think it was crystal clear from the NEC complaint that they were saying that Cardinal and AmerisourceBergen weren't surveyed. That's the essence of his claim against them. Your Honor, with respect to the original source argument, on the direct, obviously it's got to be both direct and independent. With respect to the direct, Belaiter puts in an affidavit, it says back in 2002 he talked to someone from AmerisourceBergen who said, told him, we weren't surveyed. People have been asking me that. I've told everybody that. It says he looked at some identified communications and saw some information there which he really doesn't identify. That's exactly the kind of second, third, we don't know if it's even fourth-hand information that Judge Ross' opinion in Schuman says is not direct. Final point, Your Honor, is this. There's another reason why the Belaiter is not an original source as to AmerisourceBergen, and that's the independent crime, because his allegations cannot depend on a prior public disclosure that consists of a source listed in 3730 E4A. And here it's clear that his disclosures, his allegations, are premised on the NEC case. They match it. They only appear after the NEC case appears. He says he talked to AmerisourceBergen back in 2002, but when he filed the complaint in 2005, he doesn't mention AmerisourceBergen. The whole theory is basically lifted from NEC and plopped into the new complaint against the wholesalers. And for those reasons, Your Honor, he is not an original source. All right. Thank you very much. Mr. Martin. Thank you, Your Honor. My name is Craig Martin. I represent Clinical Drug Information Substituted for Walters Clore Health, DBA Metaspan. So I'm going to call them Metaspan Publisher. A little bit of the same, and I'll be brief because you're on argument number four from our side of the fence. With regard to Metaspan, Just think how Mr. Dunlap feels. You know, you've got to sue only one person at a time sometimes. You've got to clean up. Yes, exactly. With regard to Metaspan, in the third amended complaint, there's only seven paragraphs that even talk about Metaspan. Metaspan was added in November 2006 in the second amended complaint in this case. It was added after the New England Carpenters case, after the first amended complaint and the second amended complaint. And with regard to the public disclosure issues, it is clear that in the public disclosures prior to the New England case as well as in the New England case, and they're detailed in the record and chart that we attach to our motion to dismiss at A1067 through 76, in which we go through in a very detailed fashion the first and second amended complaint in the New England Carpenters case as well as the prior media articles to demonstrate that the allegations vis-a-vis Metaspan, to the extent there really are any, were already out there in the public record. So I think there is no reasonable public disclosure issue with regard to Metaspan. With regard to the other issue. When did the first information start coming out that there might be an inflation problem? What I have in my timeline goes back to May of 2000 in a Washington Post article reporting the opinion of government official that AWP is neither average nor wholesale. Then I go to September of 2001 to a Boston Globe article that reports the industry and many joke in the industry that AWP stands for what's paid. Then I go to the AWP litigation in December of 2001 being initiated. So that's when I, at least when I go back and push the timeline that's in our briefing, as opposed to all the other briefs that are out here, that's where I started off. You know, in terms of very particular with regard to my client, we focus on the NEC lawsuit because it's just so clear. With regard to the original source issue, I won't parrot what everyone else has said about direct and independent and disclosed to the government. In this particular instance, if you look at the seven paragraphs that talk about my client, there is no evidence of any investigation with regard to my client. None in the image complaint. There's no record that they told the government. So with regard to the original source under the Schuman case and the other cases that this court has decided,  there is no investigation. But with regard to my client, there is no investigation. So I'll turn the podium over. Thank you for your time. Thank you very much. Mr. Donnellan. Good morning, Your Honors. May it please the Court. Jonathan Donnellan from First Data Bank. In response to your question, Judge Ambrose, about – Is it Donnellan? Donnellan, yes. Okay. I screwed it up. Sorry. Not at all. I was once pulled over in Ireland, and I was told by the police officer I was pronouncing my name incorrectly. So you had it right. I have it wrong. There is no new twist here. Sort of like Senator John Sherman Cooper was one time stopped by a police officer in the south, and he said, What's your name? And he said, John Sherman Cooper. And the police officer says, Son, we don't use that name down here. That's exactly right. There is no new twist here. The allegations that have been advanced about fraudulently inflating have gone back to the 1990s. And as was just stated before, the In Re AWP case is the most clear. Count one of that case lays out specific allegations about First Data Bank fraudulently inflating AWPs. The only thing it doesn't do is name First Data Bank as a party in that case, and that would be the First Amendment complaint in In Re AWP, and that's in the record at 3121. He was not the first to indicate that there was no polling being conducted by First Data Bank. That came in the New England Carpenters case. And this has been a problem throughout the briefing by a relator here, as he's trying to conflate all of his different versions of the complaint. The original complaint includes nothing about the lack of surveying. That first came in the First Amendment complaint, which came after New England Carpenters was filed and made that allegation. New England Carpenters was filed in March of 2005? Something like March 28th or something? Is that right, or am I wrong? New England Carpenters was in June 2005, and the original complaint here was in March of 2005. Okay. The complaint here was March of 2005. The other thing that he places most of his emphasis on is finding the 5% difference. And the consistent percentage of rate difference was clearly alleged also in the Fidelity and the Brown cases, both of which preceded the filing of this complaint. So all of the elements that he says that he contributed here had been publicly disclosed in other litigations and in the congressional record as well. And certainly he can't relate back, and the Supreme Court tells us this in Rockwell, you can't relate back allegations from later versions of the complaint to the original complaint. You have to take each amendment and each claim on its own merits. With respect to original source, it's very clear here with respect to First Data Bank, the only thing that he contributes here is the fact that he looked at two databases, made the mathematical calculations and the comparisons, and saw that there was a trend here. His allegations of fraud are pure speculation. There is absolutely no factual content in the original complaint to his allegations of fraud. When it gets to the mechanics of it. Have any allegations of fraud been made in any of the other cases? In terms of the New England Carpenters case sets out the lack of surveying. That has nowhere laid out any factual predicate for the relator's knowledge of that. In fact, it's very conspicuous even as he adds to his allegations of fraud in the amended complaints, he never adds to his allegations about his original source status and how he derived any of this knowledge. So there is nothing in the record here which suggests that he would be an original source for the McKesson allegations. And as for the price difference allegations, he is merely speculating about fraud. As in Schuman, where it was concluded that experience-based belief is not sufficient to confer original source status, here he attempts to do the same thing simply based on his calculations.  Thank you, Your Honor. You're going to make it four minutes. Thank you. Thank you, Your Honor. Your Honor, if I can follow up on a few of the many points that were made. This is more than just a twist. Mr. Morgan's complaint is more than just a twist on what was held before. Before there were allegations that AWP was not trustworthy. When was it that Mr. Morgan claims he first found that there were inflated numbers? The price differences he found in 1999, Your Honor. Was that about the same time that the Washington Post article came out? No, in 1999 he started to find differences. And what happened then was after the Washington Post article, First Data Bank said, we will publish, we will survey, we will publish real prices that people are actually paying. And the federal and state governments can rely on that. The federal and state governments said this is great. They actually sent letters out to pharmacies all over the country saying, because First Data Bank is now publishing real prices, we're going to rely on them. It was only after that time that Mr. Morgan continued to find price discrepancies and then had to go back and work his analysis to determine why the prices that were supposedly coming from surveys were higher than what the manufacturers were. His first complaint was in March of 2005? Yes, actually three complaints, Your Honor. Yes, he filed, I agree, Medco is still a defendant. That was my mistake. Medco was sued, though, March, I believe, 31st, 2005 in the Eastern District of Pennsylvania under seal. That's in Mr. Morgan's declaration as well as the declaration of my partner, Mr. Stone. So if he first discovered a problem in 1999, why almost six years to file a complaint? As I said, Your Honor, this was not just comparing prices. He had to go back and he looked at 50 million claims that he had amassed. He had to go back through ten years of pricing from Caremark on 250 drugs. And what he found was not all drugs had the prices inflated at the same time. And he actually called, read books, spoke to them first. Then he began to work through. And as he did audits, he said he would intentionally take audits of PBMs so he could look at the pricing to get enough data to make a determination. He actually started going to attorneys in 2003. And nobody could really get their hands around this fraud. As I said, he came to us in 2004. We then went and disclosed it to the government in Pennsylvania and New Jersey, filed these complaints, and then we began to work with the government. And we were in maybe 25 meetings with them over until 2007, Your Honor, laying out how this happened and what was involved. Like I said, it was a massive amount of data. It wasn't not something as simple as looking at that. And then even one other ---- Excuse me. Yes, Your Honor. You amended your complaint twice. Yes. And would it be unfair to say that the third amended complaint really incorporated the Brown infidelity? No, Your Honor, because as I said, if you look at the allegations in Brown, they say in 1998 AWP was unreliable. And the allegations in fidelity say that First Data Bank is actually polling wholesalers, which Mr. Morgan had determined it was not. So the allegations were actually either wrong or so old that they had been overcome by events because First Data Bank had stepped in as supposedly the voice of truth on drug pricing for the federal and state governments. So none of that was included. And if you actually go back to the original complaints from March of 2005, they lay out the scheme because, as I said, Mr. Morgan came to this determination that there was insufficient reason for the price to be higher. And then he went back. And as I was saying, it's clear he's an original source based on the amount of effort put in. If you look at the Kennard case, Your Honor, nobody else I don't think could have done this. And as I said, the evidence of that is there are no other complaints filed. In other cases, you see a number of other relators. This is not the type of case that the public disclosure bar was meant to do. When you look at the Supreme Court, it says the public disclosure bar was put in place to prevent people from bringing cases that the government could bring and to encourage people to bring cases that the government couldn't bring. And without Mr. Morgan, the government couldn't have bought this case. Thank you very much. Thank you, Your Honor. Thank you to all counsel for well-presented arguments. And we'll take the matter under advisement. Thank you, Your Honor. Thank you.